NOT FOR PUBLICATION                                                    (Doc. No. 20)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____

|  |  |  |
|---|---|---|
| KAREN E. TUCKER, | : | |
| | : | |
| Plaintiff, | : | Civil No. 07-2230 (RBK) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| KATHLEEN SEBELIUS,[1] | : | |
| Secretary of Health and Human Services, | : | |
| | : | |
| Defendant. | : | |

_____  :

**KUGLER**, United States District Judge:

This matter comes before the Court on a motion by Defendant Kathleen Sebelius,

Secretary of Health and Human Services (the "Secretary"), to dismiss the Complaint of Plaintiff

Karen E. Tucker for lack of subject matter jurisdiction.  The Complaint alleges that the Secretary

failed to process and/or pay thousands of payment requests for services allegedly rendered to

Medicare beneficiaries and seeks payment of all claims submitted.  For the reasons expressed

below, the Court will grant the Secretary's motion to dismiss.

I.      **BACKGROUND**

Karen Tucker began practicing podiatry in 1994.  Her practice consisted primarily of

providing podiatric services to nursing home patients.  Dr. Tucker got paid by submitting claims

(either by herself or through a billing agent) to Blue Cross Blue Shield of Texas a/k/a TrailBlazer

_____

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Kathleen Sebelius has
been substituted for former Secretary Michael O. Leavitt.

Health Enterprises, LLC ("TrailBlazer"), a Medicare Part B Carrier.  Dr. Tucker was not

particularly skilled in requesting Medicare payments.  In 1996, Dr. Tucker became the focus of

an investigation into health care fraud.  On May 6, 1996, a search warrant was issued for

documents at her residence.

On October 23, 1997, TrailBlazer informed Dr. Tucker that her Medicare payments were

suspended pursuant to 42 C.F.R. § 405.371 on the basis of reliable information that an

overpayment existed and a reasonable suspicion of fraud or misrepresentation.  The letter

indicated to Dr. Tucker that TrailBlazer would, however, continue to "process claims during the

suspension period" and notify her about claim determinations.  Dr. Tucker was subsequently

indicted, charged with multiple counts of health care fraud, and released pending trial.

Dr. Tucker began receiving letters from Medicare Fair Hearing Officers requesting that

Dr. Tucker submit certain required documentation that she had not included in her initial

submissions.  In December 1997 and January 1998, Dr. Tucker received letters from Medicare

Fair Hearing Officers indicating that they had not receive the required and requested

documentation, and that as a consequence a number of her appeals of unfavorable payment

decisions were being dismissed.  These letters indicated, however, that Dr. Tucker could

potentially effect a vacation of the dismissals if she provided the paperwork within six months.

During the period of her release Dr. Tucker contacted a number of physicians requesting

documentation to substantiate her allegations that these physicians authorized her, by way of

telephone, to perform podiatric care on their patients.  Ten of these physicians interpreted this

letter as a request for falsification and promptly informed the prosecutor's office.  As a result, the

government issued a superceding indictment accusing Dr. Tucker of obstruction of justice and

moved to revoke Dr. Tucker's bond under the original indictment.

On March 24, 1998, a hearing was held before Magistrate Judge Jeff Kaplan of the

Northern District of Texas with respect to the government's motion to revoke Dr. Tucker's bond.

(Complaint at Ex. 5.)  Over the government's objection, Magistrate Judge Kaplan released Dr.

Tucker subject to certain conditions including: (1) that she refrain from practicing podiatry; and

(2) that she "avoid all contact with any persons who may be a witness in this case, including any

health care providers, doctors, nursing homes, Medicare personnel, and patients."  (Id.)

In the months that followed, this order would cause significant confusion.  The

government originally understood it to prevent Dr. Tucker from continuing to submit what they

believed to be "hocus-pocus" requests for payment from Medicare for services allegedly rendered

during the period of alleged Medicare fraud.  Dr. Tucker understood it to mean that she could not

personally contact Medicare, but that she could nonetheless attempt to get paid by Medicare for

legitimate services rendered in order to pay for her criminal defense.  As a consequence, Dr.

Tucker hired a Florida Firm, Cooper Management Group, Inc., to file claims on her behalf.

On April 29, 1998, the government moved for a revocation of Dr. Tucker's bond based

on her hiring Cooper Management, which the government believed to be a violation of

Magistrate Judge Kaplan's release order.  (Complaint at Ex. 6.)  The government took the

position that Magistrate Judge Kaplan's March 24, 1998 order specifically prohibited Dr. Tucker

from filing claims with Medicare either personally or through a third-party agent.  (Id. at 6.)

Magistrate Judge Kaplan denied the government's motion because there was no evidence that

any claims had actually been submitted.  Dr. Tucker's counsel raised the issue of modifying Dr.

Tucker's terms of release to allow her to authorize Cooper Management to sort through her

paperwork and submit legitimate claims to Medicare for podiatric care provided antecedent to

March 24, 1998 and also to allow Dr. Tucker to resume practicing medicine in order to earn

income to afford to pay for her defense.  The Court noted that its previous order did not

specifically address the question of whether Dr. Tucker could bill Medicare for services rendered

prior to the ban on her practicing podiatry.[2]  However, the court did not resolve the matter

because Dr. Tucker's counsel had not made a formal motion and that motion had not been

referred from the district court.  As a consequence, the court's release order remained in effect.

On April 30, 1998, the government filed a statement regarding the modification of Dr.

Tucker's conditions of release.  The statement indicated that the government had no objection to

Dr. Tucker continuing to practice podiatric medicine to earn income and pay her attorney.  That

being said, the government insisted that the condition that Dr. Tucker not file claims with

Medicare/Medicaid while on pretrial release should remain in effect to protect the government

from "further chicanery such as the back dated physician orders."  (Complaint at Ex. 8.)  The

government noted that even if she submitted legitimate claims to Medicare, Medicare would not

pay them out until the resolution of the criminal proceedings.  Subsequently, Dr. Tucker's

counsel made a motion requesting the court to "enter an appropriate order directing the

government not to interfere in any way whatsoever, with Medicare's processing Dr. Tucker's

claims."  (Complaint at Ex. 9.)

On May 13, 1998, Chief Judge Jerry Buchmeyer held a hearing on a co-defendant's

---

[2]  The court noted: "Well, I will tell you that's a gray area that was not addressed in the order because it was not my intent at the time of the hearing to prohibit the defendant from doing – from going backwards, in other words, because I did not deem that at the time to be something that the government was concerned about, . . . ."  (Complaint Ex. 6 at 12.)

motion to suppress evidence.  At the hearing, Chief Judge Buchmeyer asked Dr. Tucker's

counsel and the Assistant United States Attorney what Magistrate Judge Kaplan did with respect

to Dr. Tucker's ability to bill Medicare and thereby earn money to pay for her defense.  Dr.

Tucker's counsel responded: "He lifted any restrictions against her practicing medicine. . . . And

he lifted any restrictions against her putting in claims."  (Complaint at Ex. 22.)  Mr. Bailey was

concerned that this was a meaningless remedy because Medicare would not pay any claims

submitted by Dr. Tucker until after the resolution of the criminal prosecution.  The Assistant

United States Attorney agreed that Magistrate Judge Kaplan had lifted the restriction on Dr.

Tucker filing claims with Medicare.  (Id.)

On June 1, 1998, Chief Judge Buchmeyer ruled that he would not enter the order

requested by Dr. Tucker nor would the court modify the conditions of her release from those set

out by Magistrate Judge Kaplan.  The judge reasoned that Medicare would not pay anything out

to Dr. Tucker anyway until the resolution of the criminal prosecution.  (Id.)

On December 18, 1998, Dr. Tucker pleaded guilty to one violation of heath care fraud.

Specifically, Dr. Tucker pleaded guilty to providing podiatric services to Zala Farley without

obtaining a specific recommendation and approval for the services from the attending physician.

On March 5, 1999, Dr. Tucker was sentenced to six months of home confinement, three years of

probation, and was required to pay $26,402 in restitution to the United States.

Following her sentencing, Dr. Tucker began the process of attempting to get paid

amounts she believed she was owed by Medicare but that she was precluded from recovering

during the pendency of her criminal prosecution.  On July 29, 1999, Dr. Tucker contacted

Medicare requesting information as to how to appeal claims previously denied at the fair hearing

and administrative law judge levels.  In a letter dated September 13, 1999, James Alexander,

M.D., the Texas Medicare Director, stated that he had asked William Young of Benefits Integrity

to give him information regarding the status of the federal litigation issues in Dr. Tucker's case,

and that Mr. Young had stated that Dr. Tucker was "allowed to appeal [her] claims at the

appropriate level."  (Complaint at Ex. 19.)

On September 13, 1999, Debra Bingham, a Medicare Provider Education Specialist at

Trailblazer, communicated with Dr. Tucker several times.  In a letter dated November 2, 1999,

Ms. Bingham stated that Medicare claims could only be accepted for the last quarter of 1997 and

all of 1998 and 1999.  Apparently, this statement was made pursuant to 42 C.F.R. § 424.44,

which requires that claims be submitted within a certain period of time after services are

rendered.  Ms. Bingham also noted that several of Dr. Tucker's fair hearing requests had been

dismissed, and that the time limit had expired for re-opening the hearing requests; thus,

TrailBlazer was unable to forward these claims to an administrative law judge.

In a fax to Dr. Alexander dated December 13, 1999, Dr. Tucker stated that Carol Alkek,

Manager of the Fair Hearings Department, had called and stated that she had no intention of

reviewing the approximately 7000 claims filed for a fair hearing because she could not find the

data on the computer system and the matter was untimely.  In a letter to Debra Bringham on the

same day, Dr. Tucker requested that her approximately 1500 outstanding claims for the years past

January - May 1996 be allowed to be submitted.  Dr. Tucker also requested the opportunity to

resubmit any and all claims submitted or not submitted or reimbursed for the year of September -

December 1994 and January - December 1995.

In April 2003, an attorney for Dr. Tucker sent two letters to Center for Medicare &

Medicaid Services ("CMS"), Region VI, requesting that CMS assist Dr. Tucker in securing

payment for outstanding claims from TrailBlazer.  On May 12, 2003, Stephanie Gammon,

Manager of the Program Integrity Branch in CMS, Region VI, requested that Dr. Tucker provide

information on the outstanding claims in dispute, after which CMS would ask the Medicare

carrier to research the claims and provide the final status of the claims.

By letter dated March 29, 2004, which was sent to Dr. Tucker's attorney, Ms. Gammon

noted that in January 2004, CMS had received three computer disks with claims information.

Ms. Gammon stated that, considering the large number of claims involved, CMS had asked

TrailBlazer to randomly select a claim for review from each of the eighteen facilities listed in the

submitted information.  The review indicated that several of the claims had been disallowed for

lack of medical necessity, with first level appeals affirming the denials, and that the other claims

were disallowed for reasons including lack of medical necessity, invalid procedure code, and

invalid date of service listed.  Ms. Gammon noted that the findings indicated that TrailBlazer

processed and adjudicated the claims correctly according to Medicare rules and regulations, that

Dr. Tucker was provided with appeal rights, and that since the claims were processed for

payment in 1996 through 1998, the timeliness for appealing the initial claim payment

determination had expired.  In addition, Ms. Gammon stated that TrailBlazer records indicate

that all cases submitted for appeals by Dr. Tucker have been adjudicated and closed accordingly

through the Fair Hearing Department.

By letter dated June 2, 2006, Susan McLaughlin, Acting Branch Manager of the Program

Integrity Branch, CMS Region VI, responded to a letter from Mary Mitchell, a representative for

Dr. Tucker.  Responding to the allegation that Dr. Tucker never received an in-person fair

hearing on numerous claims, and that no final decisions were rendered with respect to these claims, Ms. McLaughlin noted that correspondence to Dr. Tucker from the hearing officers clearly establish that Dr. Tucker's appeals were dismissed because requested documentation from Dr. Tucker was not provided.  The hearing officers stated that the dismissals could be vacated if Dr. Tucker resubmitted the requested documentation within six months of the dismissals.  Ms. McLaughlin stated that TrailBlazer had selected a sample of one appeal from each hearing officer involved in Dr. Tucker's appeals, consisting of a total of forty beneficiaries, and that no additional medical records submitted by Dr. Tucker were found.  Additional review of files and correspondence conducted by the CMS office over the past several months confirmed that there was no evidence that any documentation was submitted within six months of any of the dismissals.  Since no additional medical records were submitted by Dr. Tucker, Ms. McLaughlin noted that the dismissals of the appeals were final, and constituted the final decisions of the Secretary.

Ms. McLaughlin also addressed the September 13, 1999 letter from Dr. Alexander to Dr. Tucker.  Ms. McLaughlin noted that Dr. Alexander's letter afforded Dr. Tucker the opportunity to have someone from the Provider Education area of TrailBlazer provide additional information on appealing denied claims.  However, according to Ms. McLaughlin, the September 13, 1999 letter did not make any claims about submitting untimely documentation.

By letter dated August 25, 2006, Daniel Wolfe, Assistant Regional Counsel of the Office of General Counsel, Region VI, responded to a letter from Mary Mitchell to Susan McLaughlin, dated July 20, 2006.  Mr. Wolfe sought to address Ms. Mitchell's question regarding the deadlines for "commencing or reestablishing" legal proceedings related to Dr. Tucker's

dismissed Medicare appeals.  Mr. Wolfe stated the following:

> As you know, Congress established a limited review process for parties
> dissatisfied with the disposition of their Medicare claims . . . . Since Dr. Tucker's
> Medicare appeals were dismissed many years ago, it is apparent that Dr. Tucker
> did not timely exhaust her administrative remedies or request judicial review, as
> applicable.  Under the current circumstances, the statute provides no further
> opportunity for review by any Medicare contractor, CMS official, administrative
> tribunal, state court, or federal court.

On May 9, 2007 Plaintiff filed a Complaint requesting payment of all claims submitted

for payment, interest, and costs.  On August 18, 2008, the Secretary moved to dismiss the

Complaint on the grounds that this Court lacks subject matter jurisdiction.  On October 1, 2008,

Dr. Tucker filed an opposition brief, to which the Secretary replied on November 4, 2008.  On

December 18, 2008, Dr. Tucker filed a sur-reply, to which the Secretary replied on March 17,

2009.  Finally, on April 2, 2009, Dr. Tucker filed a "counter argument" to the Secretary's sur-sur

reply.[3]  Accordingly, the matter is now more than ripe for disposition.

## II.    STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a complaint or portions of a

complaint may be dismissed for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  A

motion to dismiss for lack of subject matter jurisdiction may be brought at any time and may

either (1) "attack the complaint on its face" or (2) "attack the existence of subject matter

jurisdiction in fact, quite apart from any pleadings."  Mortensen v. First Fed. Sav. & Loan Ass'n,

549 F.2d 884, 891 (3d Cir. 1977).  In a facial attack, all allegations in the complaint are

considered true.  Id.  In a factual attack, the court does not presume the truth of the allegations

---

[3]  Sur-replies, sur-sur replies, and sur-sur-sur replies are not permitted by the New Jersey
Federal Practice Rules.  See L. Civ. R. 7.1(d)(6).  The Court did not give permission for these
documents to be filed.  Thus, the Court will not consider them.

9

and "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power

to hear the case." Id.  In such a case, "the court can consider affidavits attached to the moving

papers or even require such affidavits to be submitted." New Hope Books, Inc. v. Farmer, 82 F.

Supp. 2d 321, 324 (D.N.J. Jan. 13, 2000) (citing Growth Horizons, Inc. v. Delaware County, Pa.,

983 F.2d 1277, 1281 n.4 (3d Cir. 1993)).  Furthermore, the plaintiff has the burden of proving

that the court has subject matter jurisdiction.  Mortensen, 549 F.2d at 891.  If a court lacks

subject matter jurisdiction, it must dismiss the case without prejudice.  In re Orthopedic "Bone

Screw" Prod. Liab. Litig., 132 F.3d 152, 155-56 (3d Cir. 1997).

## III.    DISCUSSION

The Secretary argues that the Court lacks jurisdiction for two reasons.  First, the Secretary

argues that Dr. Tucker never submitted timely requests for payment on some of her claims.

Second, the Secretary argues that Dr. Tucker did not timely pursue the vast majority of her claims

through the entirety of the administrative appeals process.  In opposition, Dr. Tucker argues that

she was prevented from submitting claims and appellate documentation to Medicare by virtue of

Magistrate Judge Kaplan's March 24, 1998 release order.

A district court has jurisdiction over an appeal taken from "a final decision" of the

Secretary made after a hearing.[4]  42 U.S.C. § 405(g); see 42 U.S.C. § 1395ff(b)(1) (judicial

---

[4]  42 U.S.C. § 405(g) provides, in pertinent part:

> Any individual, after any final decision of the Commissioner of Social Security
> made after a hearing to which he was a party, . . . may obtain a review of such
> decision by a civil action commenced within sixty days after the mailing to him of
> notice of such decision or within such further time as the Commissioner of Social
> Security may allow.

review of Secretary of Health and Human Services's final decisions governed by 42 U.S.C. §

405(g)).  At its core, this jurisdictional standard consists of two elements, namely (1) the non-

waivable requirement that the claim have been presented to the Secretary; and (2) the waivable

requirement that the claimant exhaust administrative remedies.[5]  Matthews v. Eldridge, 424 U.S.

319, 328 (1976); Heckler v. Day, 467 U.S. 104, 111 n.14 (1984); Fitzgerald v. Apfel, 148 F.3d

232, 234 (3d Cir. 1998); Kuehner v. Schweiker, 717 F.2d 813, 817 (3d Cir. 1983), vacated on

other grounds by, 469 U.S. 977 (1984); Liberty Alliance of the Blind v. Califano, 568 F.2d 333,

344 (3d Cir. 1977).

In this case, Dr. Tucker appears to have presented her claims to the Secretary.  As the

Secretary concedes, roughly 7000 of Dr. Tucker's claims were submitted for payment, denied,

appealed to the carrier hearing level, and dismissed for abandonment pursuant to 42 C.F.R. §

405.832(b).  Even though these claims were eventually dismissed, they were clearly "presented"

as they were before the Secretary for consideration.  The remainder of Dr. Tucker's claims were

not submitted to Medicare before Dr. Tucker's criminal prosecution, but appear to have been

presented to the Secretary in the manner allegedly requested by CMS personnel post-sentencing.

As a consequence, the non-waivable, jurisdictional requirement that Dr. Tucker submit her

claims to the Secretary (and thereby give the agency first crack at resolving the dispute) is

arguably satisfied.  See Lopez v. Heckler, 725 F.2d 1489, 1503 (9th Cir. 1984) ( "The non-

waivable presentment requirement has been liberally applied."), judgment vacated on other

---

[5]  The standard also contains at least two other conditions: (1) that the action be filed
within sixty days after notice of decision (or within such time as the Secretary may allow); and
(2) that the action be filed in the appropriate court.  The first of these conditions articulates a
statute of limitations; whereas, the second specifies venue.  Both are waivable by the parties.  See
Matthews v. Eldridge, 424 U.S. 319, 328 n.9 (1976).

grounds by, 469 U.S. 1082 (1984); see also Kuehner, 717 F.2d at 817 (mere termination of

claimant's social security disability benefits satisfied presentment requirement).

On the other hand, it is beyond dispute that Dr. Tucker did not exhaust her administrative

remedies.  The administrative review process of unfavorable decisions of Medicare Part B

carriers is set-out in 42 C.F.R. § 405.801.  The Medicare carrier makes an initial determination

when a request for payment is submitted.  42 C.F.R. § 405.801(a).  Dissatisfied claimants may

request a carrier-level review of the claim.  Id.  If unsatisfied with the result, claimants may then

request a carrier hearing, also known as a fair hearing.  Id.  Further review may be obtained by

way of a hearing before an administrative law judge ("ALJ").  Id.  Finally, a dissatisfied claimant

may request review by the Departmental Appeals Board ("DAB").  Id.  In this case, Dr. Tucker

did not pursue any of her claims to completion.

The question thus becomes whether the exhaustion requirement may be waived in this

case.  Either the Secretary or the court may waive the exhaustion requirement in appropriate

circumstances.  See Bacon v. Sullivan, 969 F.2d 1517, 1521 (3d Cir. 1992); Liberty Alliance of

the Blind v. Califano, 568 F.2d 333, 345 (3d Cir. 1977).[6]  The Third Circuit has found court-

based waiver in a situation where the claimant raised constitutional issues as well as in a

situation where the claimant raised "statutory issues upon which the Secretary [had] taken a final

position."  Rankin v. Heckler, 761 F.2d 936, 940 (3d Cir. 1985).  The Third Circuit has

_____

[6] The Secretary has not waived the exhaustion requirement here.  The Secretary has
explicitly moved to dismiss on grounds of failure to exhaust.  See Rankin v. Heckler, 761 F.2d
936, 941 (3d Cir. 1985).  Moreover, the Secretary's regulations do not envision that an appeal
may be taken from a dismissal by a fair hearing officer for lack of prosecution, a refusal to vacate
such a dismissal, or a refusal to excuse untimely requests.  See Bacon, 969 F.2d 1517 (3d Cir.
1992) (observing that the Social Security Act does not define the term "final decision" and that
the Secretary's regulations envision an appeal only from decisions of a DAB or an ALJ).

explained: "In those cases, the requirement of exhaustion does not serve any underlying policy, because in the former case the federal court is more qualified to address constitutional questions than the agency and in the latter case further appeals are futile in light of the final position already taken." Id. at 941.

There are three basic criteria that must be met before judicial waiver of the exhaustion requirement may be appropriate: (1) the unexhausted claim must be "substantially collateral" to the question of whether the claimant is entitled to benefits; (2) the Secretary must have taken a "fixed and final position" on the claim, thereby rendering exhaustion futile; and (3) insisting on exhaustion must be likely to cause the claimant to incur substantial hardship or irreparable harm. Kuehner v. Schweiker, 717 F.2d 813, 822-23 (3d Cir. 1983) (Becker, J., concurring), judgment vacated on other grounds by, 469 U.S. 977 (1984); see Abbey v. Sullivan, 978 F.2d 37, 44 (2d Cir. 1992). Deciding whether to waive the exhaustion requirement must not be made mechanically but rather with an eye towards the underlying policies served. Dunn v. Sullivan, 758 F. Supp. 210, 215 (D. Del. 1991) (citing Bowen v. City of New York, 476 U.S. 467, 484 (1986)). Generally speaking, these policies are "preventing premature interference with the agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefits of its experience and expertise, and to compile a record which is adequate for judicial review." Weinberger v. Salfi, 422 U.S. 749, 765 (1975).

Dr. Tucker is proceeding pro se and does not specifically identify the final decisions from which she is appealing. The Secretary understands Dr. Tucker to be appealing primarily from the dismissal of her appeals by fair hearing officers. Ordinarily, a fair hearing dismissal on grounds

of abandonment is not a final order from which a claimant may appeal under § 405(g).  See Adv.

Med. Techs., Inc. v. Shalala, 974 F. Supp. 417, 423 (D.N.J. 1997) ("[W]here claims have been

abandoned by foregoing available administrative appeals, those claims are foreclosed from

judicial review."); Long Island Ambulance v. Thompson, 220 F. Supp. 2d 150, 164 (E.D.N.Y.

2002) (observing that a party who withdrew its appeal to an ALJ and sought no further

administrative review had not obtained an appealable final decision).  In December of 1997 and

January of 1998, Dr. Tucker's claims were dismissed for abandonment because she failed to

provide the necessary documentation.  Although Dr. Tucker would like to paint the picture that

she was precluded from submitting this paperwork on the basis of Magistrate Judge Kaplan's

release order, this order was not issued until several months after the dismissals.  Waiver of the

exhaustion requirement under these circumstances is not appropriate.[7]

A fair reading of Dr. Tucker's Complaint suggests that she may also be appealing from

the Secretary's post-sentencing decision to deny payment of all her claims because a random

sampling revealed no administrative error and that "the timeliness for appealing the initial claim

payment determination has expired." (Complaint Ex. 1.1.)  For purposes of analysis, this

decision might be broken down into two parts: the Secretary's decision not to vacate dismissals

and the Secretary's decision not to consider untimely submissions and requests for review.  The

primary and overwhelming thrust of Dr. Tucker's arguments on appeal go to the idea that she

---

[7] Dr. Tucker also suggests that she could not submit the requested paperwork because the government seized her records on May 6, 1996.  This assertion is flatly contradicted by the record which indicates, amongst other things, that Dr. Tucker had bathtubs full of records and had even gone so far as to hire a third-party to sift through these records and submit claims to Medicare on Dr. Tucker's behalf during the course of her criminal prosecution.  At the time, Dr. Tucker's counsel represented to the court that the billing agent had the required documentation at her disposal.

should not be penalized for failing to submit documentation to Medicare when she was prevented from doing so by court order.  In other words, Dr. Tucker appears to take the position that the exhaustion requirement should be waived because requiring her to exhaust her administrative remedies would have potentially subjected her to further superceding indictments and perhaps the loss of freedom.

The Court does not agree that Dr. Tucker would have been irreparably harmed by complying with the administrative exhaustion requirement.   By way of letter, the Secretary informed Dr. Tucker that the dismissals of her claims could be vacated if the appropriate paperwork was submitted within six months.  Thus, Dr. Tucker had a period of several months – between December 1997/January 1998, when her claims were dismissed, and March 24, 1998, when Magistrate Judge Kaplan arguably prevented her from submitting documentation to Medicare – during which time she could have submitted the repeatedly requested paperwork in support of vacation.  As of March 23, 1998, Dr. Tucker had not done so.

On March 24, 1998 – roughly half-way through the six month period – Magistrate Judge Kaplan entered a release order.  This release order could be reasonably interpreted as preventing Dr. Tucker from submitting claims to Medicare for payment.  The government certainly took that position, at least initially.  For example, when Dr. Tucker sent letters to physicians in an attempt to get information to submit to Medicare in support of her claims, the government obtained a superceding indictment against Dr. Tucker alleging obstruction of justice.  Moreover, at a subsequent hearing to revoke Dr. Tucker's bond before Magistrate Judge Kaplan, the government argued vigorously that Dr. Tucker was barred from submitting claims to Medicare either herself or through a third-party agent.  (See Complaint Ex. 6.)  Ordinarily, the government would not be

heard before this Court to take a contrary position.[8]  See Fellner v. Tri-Union Seafoods, L.L.C.,

No. 06-688, 2010 WL 1490927, at *1 n.2 (D.N.J. April 13, 2010) (quoting In re Teleglobe

Communs. Corp., 493 F.3d 345, 377 (3d Cir. 2007)) ("Judicial estoppel is a discretionary tool

used by [c]ourts to prevent 'a party from playing fast and loose with the courts by adopting

conflicting positions in different legal proceedings (or different stages of the same

proceeding).'").

   That said, the Secretary notes that in a subsequent hearing before Chief Judge Jerry

Buchmeyer on May 13, 1998, both parties indicated that Magistrate Judge Kaplan had lifted the

ban on Dr. Tucker submitting claims.  Therefore, even if the Court were willing to accept the

proposition that Dr. Tucker risked loss of liberty and hazarded further criminal indictment by

submitting documentation to Medicare after March 24, 1998, it would appear that Dr. Tucker

regained the ability to do so without fear of reprisal several months later.  Dr. Tucker did not,

however, submit her claims to Medicare at this juncture.  Perhaps Dr. Tucker eschewed this route

because Medicare indicated that, although it would process any claims submitted, it would not

remit actual payment until the culmination of the fraud prosecution.  In any event, Dr. Tucker

---

   [8]  It is unclear from the record whether Magistrate Judge Kaplan's release order actually
prevented Dr. Tucker from submitting claims to Medicare for services already rendered.
Magistrate Judge Kaplan admitted in a subsequent hearing that his release order had not
contemplated this scenario.  Apparently, he only intended to ban Dr. Tucker from practicing
podiatry and submitting claims for services rendered during this ban.  He did not grant Dr.
Tucker's verbal motion to modify the terms of the release order to clarify that she could in fact
submit claims for past services rendered because he did not believe he had jurisdiction to
consider it at the time.  As noted, the parties subsequently agreed before Chief Judge Buchmeyer
that Magistrate Judge Kaplan had lifted the restriction.  It is unclear whether the parties were
referring to an affirmative order of Magistrate Judge Kaplan to this effect, or whether they both
interpreted Magistrate Judge Kaplan's statement that he had not considered the issue of Dr.
Tucker's submitting past claims to Medicare as a binding interpretation of the original release
order.

was sentenced on March 5, 1999, which should have resolved any residual doubt as to

restrictions on Dr. Tucker submitting paperwork to Medicare going forward.  Apparently,

however, Dr. Tucker did not contact Medicare and begin submitting until some four months later

in July of 1999.

Subsequently, Medicare concluded that the dismissals of Dr. Tucker's claims should not

be vacated and that her requests to file untimely claims as an original matter should be denied.

Decisions such as these are committed to the sound discretion of the Secretary.  See, e.g., 42

C.F.R. § 405.832(e) (providing for vacation of dismissal "on request of a party and for good and

sufficient cause shown . . . at any time within 6 months from the date of mailing notice of

dismissal . . . .").   The Secretary's decision to dismiss claims on procedural grounds such as

untimeliness are not appealable final decisions.  See Bacon, 969 F.2d at 1521.

There are no special circumstances in this case that counsel reaching a different result.

See id. (noting that "under certain limited circumstances" the Secretary's decision not to review a

claimant's late filing may constitute a final decision for purposes of § 405(g)).  Dr. Tucker could

have submitted the appropriate documentation as an initial matter without fear of irreparable

harm.  She did not.  Dr. Tucker could have submitted the appropriate documentation upon the

Fair Hearing Officers' initial requests without fear of irreparable harm.  She did not.  Dr. Tucker

could have submitted the appropriate documentation in the months that followed the dismissals

and preceded Magistrate Judge Kaplan's release order without fear of irreparable harm.  She did

not.  Finally, Dr. Tucker could have submitted her paperwork immediately after the release order

became inoperative (either by way of clarification, modification, or natural expiration) without

fear of irreparable harm.  She did not.  In other words, Dr. Tucker could have and should have

exhausted her administrative remedies in a timely manner.  Holding Dr. Tucker to the exhaustion

requirement would not and does not result in irreparable harm.[9]  Accordingly, the Court

concludes that waiver of the exhaustion requirement is not warranted in this case, and that

consequently the Secretary's decisions in this case are not final decisions for purposes of §

405(g).  The Court lacks jurisdiction over Dr. Tucker's Complaint and will dismiss it.

## IV.    CONCLUSION

For the foregoing reasons, the Secretary's motion to dismiss will be granted.  An

appropriate order shall enter.


Dated: 7-12-2010                                                    /s/ Robert B. Kugler
                                                                   ROBERT B. KUGLER
                                                                   United States District Judge

---

[9]  Because the Court concludes that exhausting administrative remedies would not have
resulted in irreparable harm, the Court need not consider the further issue of whether Dr.
Tucker's claims raise collateral issues.  The Court notes that Dr. Tucker explicitly raises no
constitutional claims and that her demand for relief is processing and payment of her requests for
payment.